**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **RYAN FULLER,** | |
| **Plaintiff,** | **No. 12 C 0171** |
| **v.** | **Magistrate Judge Mary M. Rowland** |
| **MICHAEL J. ASTRUE,** | |
| **Commissioner of Social Security,** | |
| **Defendant.** | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Ryan Fuller filed this action seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits and Supplemental Security Income under Titles II and XVI of the Social Security Act ("SSA"). 42 U.S.C. §§ 416, 423(d), 1381a. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and the parties have filed cross motions for summary judgment. For the reasons stated below, the case is remanded for further proceedings consistent with this opinion.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits ("DIB") or Supplemental Security Income ("SSI") under Titles II and XVI of the SSA, a claimant must establish that he

or she is disabled within the meaning of the SSA.[1] *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001); *Keener v. Astrue*, No. 06 C 0928, 2008 WL 687132, at *1 (S.D. Ill. March 10, 2008). A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520, 416.909, 416.920; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq*. The SSI regulations are virtually identical to the DIB regulations and are set forth at 20 C.F.R. § 416.901 *et seq*.

## II. PROCEDURAL HISTORY

Plaintiff was born on October 20, 1982. (R. at 123). He applied for DIB and SSI on January 8, 2008, alleging that he became disabled on January 1, 2004, due to epilepsy, seizures and hallucinations.[2] (*Id.* at 24, 68–69, 123–32, 180–81). The applications were denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 24, 67–86, 92–107, 108–09).

On November 17, 2009, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge ("ALJ"). (R. at 24, 41–66). The ALJ also heard testimony from Linda Gels, a vocational expert ("VE").[3] (*Id.*).

The ALJ denied Plaintiff's request for benefits on February 22, 2010. (R. at 24–35). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since January 1, 2004, the original alleged onset date. (*Id.* at 27). At step two, the ALJ found that Plaintiff's seizure disorder, mood disorder secondary to traumatic brain injury, and polysubstance abuse are severe impairments. (*Id.*). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments

---

[2] Plaintiff also applied for Childhood Disability Benefits ("CDB") on January 8, 2008. (R. at 24, 67). CDB "provides a monthly benefit for designated surviving family members of a deceased insured wage earner." *Astrue v. Capato ex rel. B.N.C.*, 132 S. Ct. 2021, 2027 (2012). In general, an individual qualifies for CDB if he or she is below a specified age limit (18 or 19), or is under a disability which began prior to age 22, and was dependent on the insured at the time of the insured's death. 42 U.S.C. § 402(d)(1). At his hearing, Plaintiff amended his alleged onset date from January 1, 2004, to December 10, 2007. (R. at 24, 122). Because he was 25 years old on the revised onset date, Plaintiff does not qualify for CDB.

[3] The hearing transcript incorrectly referred to the VE as Linda Geld. (*Compare* R. at 24 *with id.* at 41, 42).

that meet or medically equal the severity of any of the listings enumerated in the regulations. (*Id.*).

The ALJ then assessed Plaintiff's residual functional capacity ("RFC")[4] and determined that he has the RFC to

> perform a full range of unskilled work at all exertional levels subject to postural limitations of never climbing ladders, ropes, or scaffolding, [an] environmental limitation to avoid concentrated exposure to work hazards such as heights and moving machinery, and subject to non-exertional limitations that the work require the performance of simple 1-, 2-, or 3-step tasks in a work environment that requires only occasional contact with the public.

(R. at 30). At step four, the ALJ determined that Plaintiff had no past relevant work. (*Id.* at 33). At step five, based on Plaintiff's RFC, his vocational factors and the VE's testimony, the ALJ determined that there are jobs that exist in significant numbers in the regional economy that Plaintiff can perform, including dining room attendant, hand packer, and cafeteria attendant. (Id. at 34). Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability as defined by the SSA. (*Id.* at 34–35).

The Appeals Council denied Plaintiff's request for review on July 22, 2011. (R. at 9–12.) Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

---

[4] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. § 404.1520(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008).

## III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young*, 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent mean-

ingful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

# IV. DISCUSSION

## A. The Relevant Medical Evidence

In 1996, at age 16, Plaintiff suffered a traumatic brain injury when he was kicked in the head 12 times with a steel-toe boot. (R. at 411, 439). This injury led to Plaintiff suffering recurring seizures. (*Id.* at 403, 439).

On July 4, 2006, Plaintiff was watching fireworks when a stray shell exploded approximately 10 feet from him. (R. at 304). He was found lying supine on the ground in a panicked state and taken by ambulance to Elmhurst Memorial Healthcare. (*Id.* at 297, 304). Plaintiff was diagnosed as having an anxiety attack, discharged, and urged to contact his medical doctor for follow-up care. (*Id.* at 297).

Plaintiff treated regularly at DuPage County Health Department from November 2007 through the date of the hearing. (R. at 318–28, 355–99, 407–54). On December 10, 2007, in an initial psychiatric assessment, Plaintiff was diagnosed with a mood disorder secondary to traumatic injury[5] and post-traumatic stress disorder (PTSD). (*Id.* at 327). Plaintiff reported experiencing occasional suicidal ideations and ongoing hallucinations, including hearing voices and visualizing dark figures.

---

[5] The essential feature of a mood disorder due to a general medical condition "is a prominent and persistent disturbance of mood that is judged to be due to the direct physiological effects of a general medical condition." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 401 (4th ed. Text Rev. 2000) (hereinafter DSM-IV). The mood disturbance causes "clinically significant distress or impairment in social, occupational, or other important areas of functioning." *Id.*

(*Id.* at 326). Plaintiff's psychiatrist assessed Plaintiff's judgment as poor, his mood as depressed, and estimated his Global Assessment of Functioning ("GAF") at 45–50.[6] (*Id.* at 326–27). The psychiatrist prescribed 100mg Seroquel and 400mg Tegretol daily.[7] (*Id.* at 246, 328).

On February 25, 2008, Plaintiff reported that he was doing very well. (R. at 323–24). He was tolerating his medications and had not had a seizure in six months. (*Id.* at 323). His judgment and insight were assessed as fair. (*Id.*). Plaintiff was diagnosed with mood disorder secondary to general medical condition, seizures and head injury, and assigned a GAF score of 50. (*Id.* at 324). Stephen T. Penepacker, M.D., one of Plaintiff's psychiatrists at the DuPage County Health Department, continued Plaintiff on Tegretol and Seroquel. (*Id.* at 325, 377).

On March 26, 2008, Plaintiff had ongoing symptoms of a mood disorder, including included irritability and decreased motivation, that was complicated by traumatic brain injury, impairing Plaintiff's ability to function adequately. (R. at 412; *see id.* at 363–68). He was diagnosed with mood disorder due to traumatic brain injury, alcohol abuse and cocaine abuse. (*Id.* at 411). Dr. Penepacker reviewed and approved this diagnosis on May 20, 2008. (*Id.* at 412).

---

[6] The GAF includes a scale ranging from 0–100, and indicates a "clinician's judgment of the individual's overall level of functioning." DSM-IV at 32. A GAF score of 41–50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* at 34.

[7] Seroquel (quetiapine) is used to treat symptoms of schizophrenia, mania and depression. Tegretol (carbamazepine) is used to control seizures and treat episodes of mania. <www.nlm.nih.gov/medlineplus> [hereinafter MedlinePlus].

On April 8, 2008, Plaintiff reported that he had stopped taking Seroquel because he thought it was not working. (R. at 388). His therapist observed that Plaintiff struggled with insight about how things work—he did not understand the importance of getting blood work and being compliant with his medications. (*Id.*). Plaintiff agreed to restart his Seroquel. (*Id.*).

On May 7, 2008, Donald Cochran, Ph.D., a nonexamining state agency physician, completed a Psychiatric Review Technique form. (R. at 337–50). Dr. Cochran concluded that Plaintiff suffers from an organic mental disorder, status post motor vehicle accident; depression, secondary to general medical condition; and a history of substance abuse.[8] (*Id.* at 337, 338, 340, 345). Dr. Cochran opined that these impairments resulted in moderate restrictions of activities of daily living, moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. (*Id.* at 347). In computing Plaintiff's mental RFC, Dr. Cochran found that Plaintiff was moderately limited in the ability to understand and remember detailed instructions, carry out

---

[8] A person who is otherwise disabled cannot receive SSI or DIB benefits if alcoholism or drug addiction is a "contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). Thus, "[w]hen an applicant for disability benefits both has a potentially disabling illness and is a substance abuser, the issue for the administrative law judge is whether, were the applicant not a substance abuser, she would still be disabled." *Kangail v. Barnhart*, 454 F.3d 627, 628 (7th Cir. 2006); see 20 C.F.R. § 404.1535(b)(1) ("The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol."). If the ALJ finds that the claimant would still be disabled if she stopped using drugs or alcohol, "she is deemed disabled 'independent of [her] drug addiction or alcoholism' and is therefore entitled to benefits." *Kangail*, 454 F.3d at 629 (quoting 20 C.F.R. § 404.1535(b)(2) (ii)). Here, because the ALJ found that Plaintiff was *not* disabled, she did not need to determine whether his substance abuse was a material contributing factor.

detailed instructions, maintain attention and concentration for extended periods and perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (*Id.* at 351). Dr. Cochran opined that Plaintiff was capable of performing simple 1- and 2-step work tasks. (*Id.* at 353). Dr. Cochran's assessment was affirmed on September 30, 2008. (*Id.* at 404–06).

On May 20, 2008, Dr. Penepacker found that Plaintiff had suffered several discrete psychotic episodes with agitation and some self-injury, apparently caused by head trauma, as well as seizures. (R. at 440–41). Plaintiff reported that his seizures were no longer as frequent as they were after his 1996 traumatic brain injury. (*Id.* at 439). Nevertheless, during his occasional seizures he loses consciousness for one to three minutes but never has convulsions, is disoriented and falls around, and recovers within one to two days. (*Id.*). Dr. Penepacker diagnosed mood disorder secondary to traumatic brain injury, alcohol and cocaine abuse, and assigned a GAF score of 45. (*Id.* at 440). He recommended that Plaintiff follow-up on his seizure disorder with his medical doctor. (*Id.*). Dr. Penepacker declined to increase Plaintiff's Seroquel medication to combat his persistent irritability because the increase would reduce Plaintiff's seizure threshold. (*Id.* at 373, 440).

On September 2, 2008, Dr. Penepacker completed a Psychiatric Report. (R. at 359–62). He noted that Plaintiff exhibited evidence of cognitive impairment, possibly due to his brain injury and seizure disorder. (*Id.* at 359, 362). Plaintiff reported ongoing irritability and several past episodes of psychosis and self-injury, which had begun abruptly five to six years prior after getting emergency treatment for sei-

zures. (*Id.*). On examination, Dr. Penepacker found a constricted affect, limited short term memory, and an inability to do multiplication. (*Id.* at 360–61). He opined that Plaintiff was unable to manage his own funds, had serious limitations with completion of household duties, and serious limitations with work-related functioning. (*Id.* at 361). Specifically, Dr. Penepacker concluded that Plaintiff had serious limitations with the ability to independently initiate, sustain or complete tasks; understand, carry out and remember instructions on a sustained basis; respond appropriately to supervision, coworkers, and customary work pressures; perform tasks on an autonomous basis without direct step-by-step supervision and direction; and perform tasks on a sustained basis without undue interruption or distractions. (*Id.* at 361–62).

On September 9, 2008, Plaintiff reported that that his depression had worsened in recent months. (R. at 436). He was afraid to take antidepressants because when he took them in the past, they gave him suicidal thoughts. (*Id.*). Plaintiff stated he was not functioning very well—he sits in his room and stares at the wall for hours at a time. (*Id.*). Dr. Penepacker diagnosed mood disorder secondary to traumatic brain injury and assessed a GAF score of 45. (*Id.* at 437). He concluded that given Plaintiff's poor social situations, he was not likely to respond to medications. (*Id.*).

On September 11, 2008, Plaintiff's therapist completed a Mental Disorders Report. (R. at 402–03). She opined that Plaintiff's mood disorder markedly restricts his daily activities, socialization, ability to sustain communication and attention, and ability to complete tasks. (*Id.*). Based upon her observations and interactions with

Plaintiff, the therapist concluded that Plaintiff would be unable to function in a competitive, full-time, work setting. (*Id.* at 403).

On October 2, 2008, Dr. Penepacker concluded that Plaintiff was "medically unable to work." (R. at 409). He further opined that it was "unlikely [Plaintiff] would be able to work within the next 6 months." (*Id.*).

On October 15, 2008, Plaintiff reported to his therapist that he experienced two visual hallucinations in the previous week. (R. at 427). He reported feeling "overwhelmed" and stated that he often does not eat during the day or eats only one small meal. (*Id.*). On January 6, 2009, Plaintiff's therapist stated that Plaintiff displayed very poor hygiene. (*Id.* at 410, 416). Plaintiff reported playing video games 8–9 hours a day and never leaving the house on his own. (*Id.*). He eats only every other day when he is hungry. (*Id.* at 416).

On November 18, 2008, Plaintiff reported feeling worthless and sleeping more than 12 hours a day. (R. at 434). Dr. Penepacker continued his previous diagnosis of a mood disorder secondary to traumatic brain injury, alcohol abuse, cocaine abuse, and a history of head injury, seizure disorder and positive TB skin test. (*Id.* at 435). Dr. Penepacker assessed Plaintiff's GAF score as 45 and started him on 10mg Lexapro and decreased his Seroquel to 50mg.[9] (*Id.* at 435, 445).

On January 27, 2009, Dr. Penepacker concluded that Plaintiff remains "very impaired by ongoing cognitive impairments and lack of motivation. He sleeps 12 hours

---

[9] Lexapro (escitalopram) is used to treat depression and generalized anxiety disorder. *See* MedlinePlus.

per day[,] . . . display[s] poor hygiene and doesn't leave the house on his own." (R. at 410). Dr. Penepacker opined that Plaintiff's "residual depressive symptoms . . . appear to be consequences, rather than causes, of his cognitive impairment and inability to function." (*Id.*). Dr. Penepacker remained skeptical that Plaintiff's "cognitive impairment or motivation [would] improve with any available medical treatment." (*Id.*).

On February 3, 2009, during Plaintiff and his mother's visit with Dr. Penepacker, they reported that Plaintiff was suffering from recent hallucinations:

> [Plaintiff] then reported hallucinations to [his mother], [he] saw a figure in church, laughing at him, so he yelled shut up. When he looked again, it was gone. [Plaintiff] didn't realize at first he was hallucinating. Mother reports [that on] Jan[uary] 20, [Plaintiff] moved head side to side few times, felt dizzy, then assumed strange posture as if holding something, which he wasn't, told her he was waiting for elevator—didn't know where he was for 15 seconds. [Plaintiff] states he saw stairs change into escalator. That night he couldn't find his pills in his pill container. In another episode, [Plaintiff] thought elevator was falling after someone rolled big piece of furniture on at storage house.

(R. at 431). Plaintiff's sleep is inconsistent; sometimes he stays awake all night, playing video games. (*Id.*). A November 12, 2008 EEG and a November 6, 2008 MRI were both normal. (*Id.*) Nevertheless, Dr. Penepacker found that Plaintiff "remains unable to function in any way, socially or vocationally, unable to come up with realistic plan for achieving independence." (*Id.*). He diagnosed mood disorder secondary to traumatic brain injury, with psychosis; past alcohol abuse; past cocaine abuse; history of ADHD and learning disability; history of head injury, seizure disorder, and positive TB skin test; and assessed a GAF score of 45. (*Id.* at 432). Dr. Penepacker discontinued Lexapro as a possible trigger of recent psychosis. (*Id.*).

On February 17, 2009, Plaintiff reported that the reduced dosage of Seroquel was not working as well as the previous dosage. (*Id.* at 414.) His hygiene remained poor. (*Id.*). On February 18, 2009, Dr. Penepacker increased his Seroquel dosage back to 100mg. (*Id.* at 442).

On March 31, 2009, Plaintiff reported hallucinations once to twice per week. (R. at 429) ("I was washing my hands, and I thought my hand was on fire, I saw it." [Plaintiff] "saw something coming out of the wall at him, 'made me fly off the chair,' describes it as a flash, only there for an instant."). He said that his mood "bounces" without Lexapro, sometimes staring at the wall, not wanting to do anything. (*Id.*). Plaintiff reported no improvement with the 100mg Seroquel dosage. (*Id.*). Dr. Penepacker resumed Lexapro, as Plaintiff felt worse and his hallucinations were continuing, and increased Seroquel dosage to 200mg. (*Id.* at 430). On June 23, 2009, Dr. Penepacker increased Plaintiff's Tegretol dosage to 600mg daily. (*Id.* at 452).

On September 15, 2009, Plaintiff reported that his symptoms had improved over the previous six months. (R. at 449). He was compliant with his medications and able to get out of the house one to three times a week. (*Id.*). Nevertheless, Plaintiff still struggled with his personal hygiene and suffered from frequent depression, anger and irritability. (*Id.*)

On November 2, 2009, Dr. Penepacker found ongoing symptoms of mood disorder that included irritability, and a lack of motivation that was complicated by traumatic brain injury, which impaired Plaintiff's ability to function in work and social situations and with relationships. (R. at 453). Plaintiff reported that with the higher

Tegretol dosage, he feels "back to [his] old self." (*Id.*). He was sleeping 6–8 hours at night and his energy level was "okay during the day." (*Id.*). Nevertheless, he stated that his memory and concentration were still not good, he was easily distracted, and felt better when he is alone. (*Id.*). Dr. Penepacker diagnosed mood disorder due to general medical condition, alcohol abuse and cocaine abuse, and assessed a GAF score of 40.[10] (*Id.* at 450). Because Plaintiff's progress was "stable" and he "appears to be doing as well as any point I've seen," Dr. Penpacker decreased Plaintiff's Seroquel dosage to 150mg and continued him on 600mg Tegretol and 10mg Lexapro daily. (*Id.* at 450, 454).

In his Function Report, Plaintiff reported hallucinations, hearing voices, and erratic behaviors. (R. at 181). Plaintiff stated that he has severe problems with not being able to concentrate, comprehend or stay focused. (*Id.* at 175, 182). His abilities are affected by seizures. (*Id.* at 180). It takes him 2 days to 2 weeks to recover fully after a seizure. (*Id.*).

At his hearing, Plaintiff testified that he experiences seizures every three months. (R. at 49). He gets about a 10-second warning before going unconscious and falling. (*Id.*).

Plaintiff stated that he has difficulty thinking, concentrating, focusing and memorizing, and frequently experiences hallucinations, delusions and paranoia. (R.

---

[10] A GAF score of 31–40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). DSM-IV at 34.

at 50). He has to be reminded to take care of his personal hygiene like brushing his teeth or taking a shower, or he will forget to do it. (*Id.* at 59). He has trouble sleeping; he has a good night's sleep only about twice a week. (*Id.* at 53, 57). He often experiences nightmares; sometimes he stays up all night and then sleeps most of the day. (*Id.*).

Plaintiff testified that he used to have suicidal ideations but the antidepressants now seem to be working. (R. at 57). His mood bounces up and down. (*Id.*). Sometimes the Tegretol seems to help, on other days it does not. (*Id.* at 58).

## B. Analysis

Plaintiff raises two arguments in support of his request for a reversal and remand: (1) the ALJ did not give proper consideration to the treating psychiatrist's opinion; and (2) the ALJ's credibility finding is not supported by substantial evidence. (Mot. 7–13).

Plaintiff contends that the ALJ failed to give controlling weight to the opinion of Dr. Penepacker, his treating psychiatrist. (Mot. 7–10). Plaintiff argues that the ALJ did not consider the medical evidence as a whole and did not offer "good reasons" for failing to give Dr. Penepacker's opinion controlling weight. (*Id.*).

By rule, "in determining whether a claimant is entitled to Social Security disability benefits, special weight is accorded opinions of the claimant's treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not in-

consistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2); *accord Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). A treating physician typically has a better opportunity to judge a claimant's limitations than a nontreating physician. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); *Grindle v. Sullivan*, 774 F. Supp. 1501, 1507–08 (N.D. Ill. 1991). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Therefore, an ALJ "must offer 'good reasons' for discounting a treating physician's opinion," and "can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2); other citation omitted).

If a nontreating physician contradicts the treating physician's opinion, it is the ALJ's responsibility to resolve the conflict. *Books*, 91 F.3d at 979 (ALJ must decide which doctor to believe). An ALJ may reject the opinion of a treating physician in favor of the opinion of a nontreating physician where the nontreating physician has special, pertinent expertise and where the issue is one of interpretation of records or results rather than one of judgment based on observations over a period of time. *Micus v. Bowen*, 979 F.2d 602, 608 (7th Cir. 1992) ("[I]t is up to the ALJ to decide which doctor to believe—the treating physician who has experience and knowledge of the case, but may be biased, or . . . the consulting physician, who may bring expertise and knowledge of similar cases—subject only to the requirement that the

ALJ's decision be supported by substantial evidence."); *Hofslien v. Astrue*, 439 F.3d 375, 377 (7th Cir. 2006) ("So the weight properly to be given to testimony or other evidence of a treating physician depends on circumstances."). In sum, "whenever an ALJ does reject a treating source's opinion, a sound explanation must be given for that decision." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)).

In September 2008, Dr. Penepacker opined that Plaintiff was unable to manage his own funds, had serious limitations with completion of household duties, and serious limitations with work-related functioning. (R. at 361). Specifically, he concluded that Plaintiff had serious limitations with the ability to independently initiate, sustain or complete tasks; understand, carry out and remember instructions on a sustained basis; respond appropriately to supervision, coworkers, and customary work pressures; perform tasks on an autonomous basis without direct step-by-step supervision and direction; and perform tasks on a sustained basis without undue interruption or distractions. (*Id.* at 361–62). In October 2008, Dr. Penepacker concluded that Plaintiff was medically unable to work and found it unlikely that Plaintiff would be able to work within the next six months. (*Id.* at 409). In January 2009, Dr. Penepacker concluded that Plaintiff's "residual depressive symptoms . . . appear to be consequences, rather than causes, of his cognitive impairment and inability to function." (*Id.* at 410). Dr. Penepacker remained skeptical that Plaintiff's "cognitive impairment or motivation [would] improve with any available medical treatment." (*Id.*).

In her decision, the ALJ gave Dr. Penepacker's statements "little consideration." (R. at 33). She discounted Dr. Penepacker's opinions because they relied primarily on information provided by Plaintiff and his mother rather than the doctor's own observations and were not supported by the medical record. (*Id.* at 32–33). The ALJ gave "some weight" to the opinion of the state agency psychological consultant. (*Id.* at 33).

Under the circumstances, the ALJ's decision to give Dr. Penepacker's opinions "little consideration" is legally insufficient and not supported by substantial evidence. First, the ALJ's contention that Dr. Penepacker "submitted his first statement in May 2008, after one session with [Plaintiff]" (R. at 32), is not entirely accurate. Dr. Penepacker's first statement was actually in September 2008. (*Id.* at 359–62). And while Dr. Penepacker had only one prior session with Plaintiff—on May 20, 2008—Plaintiff had been seen by other psychiatrists and therapists at the Du-Page County Health Department on at least six other occasions beginning in November 2007, and Dr. Penepacker reviewed those treatment notes before completing his September 2008 opinion. (*See id.* at 323–27, 363–68, 372, 377, 388, 397, 411–12, 442). By the time that Dr. Penepacker submitted his January 2009 report, he had seen Plaintiff three times and had reviewed additional treatment notes entered by his colleagues. (*Id.* at 440–41, 402–03, 410, 416, 427, 434–35, 436–37).

Second, Dr. Penepacker's opinions were not based *solely* on Plaintiff's subjective complaints. If a "treating physician's opinion is . . . based *solely* on the patient's subjective complaints, the ALJ may discount it." *Ketelboeter v. Astrue*, 550 F.3d 620,

625 (7th Cir. 2008) (emphasis added). Dr. Penepacker's opinions were not mere reci-
tations of Plaintiff's complaints but were also based on objective observations made
by Plaintiff's psychiatrists and therapists. (*See, e.g.*, (R. at 327 (depressed mood),
360–62 (constricted affect, limited short term memory, inability to do multiplica-
tion, and evidence of cognitive impairment), 369 (fair judgment), 375 (constricted
affect), 395 (limited insight and memory), 410 (cognitive impairments and lack of
motivation), 416 (poor personal hygiene), 423 (overwhelmed), 425 (sad), 427 (griev-
ing, overwhelmed and nonfunctioning), 429 (constricted affect), 431–32 (poor hy-
giene, constricted affect and cognitive defects), 434 (constricted affect), 436 (difficul-
ty with abstraction and planning, and constricted affect), 440 (constricted affect),
453 (irritable and lack of motivation)); *cf. Rice v. Barnhart*, 384 F.3d 363, 371 (7th
Cir. 2004) ("[M]edical opinions upon which an ALJ should rely need to be based on
objective observations and not amount merely to a recitation of a claimant's subjec-
tive complaints.").

Almost all diagnoses—especially mental health evaluations—require some con-
sideration of the claimant's subjective symptoms, and here, Plaintiff's and his moth-
er's statements were necessarily factored into Dr. Penepacker's analysis. *See
McClinton v. Astrue*, No. 09 C 4814, 2012 WL 401030, at *11 (N.D. Ill. Feb. 6, 2012
("Almost all diagnoses require some consideration of the patient's subjective reports,
and certainly [the claimant's] reports had to be factored into the calculus that yield-
ed the doctor's opinion."). And there is nothing in the record to suggest that Dr. Pe-
nepacker disbelieved Plaintiff's or his mother's descriptions of his symptoms, or that

Dr. Penepacker relied more heavily on their descriptions than his own clinical observations, and those of his colleagues, in concluding that Plaintiff was incapable of full-time work. *See Davis v. Astrue*, No. 11 C 0056, 2012 WL 983696, at *19 (N.D. Ill. March 21, 2012) ("The ALJ fails to point to anything that suggests that the weight [the claimant's treating psychiatrist] accorded Plaintiff's reports was out of the ordinary or unnecessary, much less questionable or unreliable."); *Ryan v. Comm'r*, 528 F.3d 1194, 1199–200 (9th Cir. 2008) ("[A]n ALJ does not provide clear and convincing reasons for rejecting an examining physician's opinion by questioning the credibility of the patient's complaints where the doctor does not discredit those complaints and supports his ultimate opinion with his own observations.").

Third, the medical evidence supports Dr. Penepacker's opinions. For example, Plaintiff's GAF score was consistently assessed at 40–50 from December 2007 through November 2009. (R. at 324, 327, 432, 437, 440, 450). A GAF score of 41–50 indicates "serious" symptoms, including serious impairment in occupational functioning. DSM-IV at 34. Similarly, Plaintiff was consistently diagnosed with a mood disorder due to a general medical condition, which involves a "prominent and persistent disturbance in mood." *Id.* at 401. Throughout the relevant time period, Plaintiff experienced hallucinations, occasional suicidal ideations, hearing voices, irritability, decreased motivation, psychotic episodes, limited short term memory, inability to function, poor hygiene, inconsistent eating and sleep habits, depression, and poor judgment and insight. (R. at 323, 326, 359–62, 410, 412, 416, 427, 429–31, 436, 440–41, 449, 453).

The ALJ discounts this medical evidence, pointing to medical records in September and November 2009, which suggested that Plaintiff's symptoms had improved:

> Dr. Penepacker opined that [Plaintiff] "appears to be doing as well as any point I've seen." [Plaintiff] reported that because of his current medication regimen, "I think I'm back to my old self." He also reported he was sleeping six to eight hours at night and his energy during the day was "okay." [Plaintiff] stated that he was still easily distracted, but understood the problem and how to accommodate for it, telling Dr. Penepacker that he felt he worked better alone.

(R. at 33) (citing *id.* at 453–54); (*see also id.* at 449). But the September 2009 treatment notes also indicated that Plaintiff still struggles with his personal hygiene and suffers from frequent depression, anger and irritability. (*Id.* at 449). And the November 2009 treatment notes reported that Plaintiff's memory and concentration were still not good, he was easily distracted, and feels better when left alone. (*Id.* at 453).

The ALJ cannot discuss only those portions of the record that support her opinion. *See Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) ( "An ALJ may not selectively consider medical reports, especially those of treating physicians, but must consider all relevant evidence. It is not enough for the ALJ to address mere portions of a doctor's report.") (citations omitted); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ cannot disregard medical evidence simply because it is at odds with the ALJ's own unqualified opinion."). By isolating a couple treatment records, the ALJ demonstrated a fundamental misunderstanding of mental illness; a person who suffers from a mood disorder will have good days and bad days. *See* DSM-IV at 401, 404 (A mood disorder "may involve depressed mood; markedly diminished in-

terest or pleasure; or elevated, expansive, or irritable mood."); *Punzio*, 630 F.3d at 710 ("But by cherry-picking [the treating physician's] file to locate a single treatment note that purportedly undermines her overall assessment of [the claimant's] functional limitations, the ALJ demonstrated a fundamental, but regrettably all-too-common, misunderstanding of mental illness. As we have explained before, a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition.") (citations omitted); *see also Bauer*, 532 F.3d at 609 ("A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days; that is true of the plaintiff in this case. Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job."). Even assuming that Plaintiff's "improved" symptoms were more than isolated instances, it does not mean that he was capable of maintaining a full-time work schedule. It may simply mean that by November 2009, Plaintiff's symptoms had stabilized to the point that they had been when Dr. Penepacker first saw him in March 2008—ongoing symptoms of a mood disorder complicated by traumatic brain injury, all of which impaired Plaintiff's ability to function. *See Scott v. Astrue*, 647 F.3d 734, 739–40 (7th Cir. 2011) ("There can be a great distance between a patient who responds to treatment and one who is able to enter the workforce, and that difference is borne out in [the physician's] treatment notes.").

Fourth, the opinion of the nonexamining state agency psychological consultant is not sufficient to reject Dr. Penepacker's opinion. A "contradictory opinion of a non-examining physician does not, by itself, suffice" to provide the evidence necessary to reject a treating physician's opinion. *Gudgel*, 345 F.3d at 470; *Oakes v. Astrue*, 258 F. App'x 38, 44 (7th Cir. 2007); *see Holmes v. Astrue*, No. 08 C 338, 2008 WL 5111064, at *7 (W.D. Wis. 2008) ("A contradictory opinion of a non-examining physician is not sufficient by itself to provide the evidence necessary to reject a treating physician's opinion."). Indeed, "the opinions of physicians or psychologists who do not have a treatment relationship with the individual are weighed by stricter standards, based to a greater degree on medical evidence, qualifications, and explanations for the opinions, than are required of treating sources." Social Security Ruling ("SSR")[11] 96-6p, at *2. Thus, the agency consultant's opinion can be given weight only if it is "supported by evidence in the case record." *Id.* In determining the weight to afford the nonexamining consultant's opinion, the ALJ must consider: (1) whether the opinion is supported by the medical evidence, including evidence received by the ALJ that was not before the state agency; (2) whether the opinion is consistent with the record as a whole, including other medical opinions; (3) any explanations provided by the agency consultants; and (4) the agency consultant's specialization, if any. *See id.*

---

[11] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

Here, the state agency consultant's opinion is entitled to little weight. Dr. Cochran reviewed the DuPage County Health Department records from December 2007 through February 2008 and acknowledged that Plaintiff had been diagnosed with a mood disorder. (R. at 349; *see id.* at 318–28). However, Dr. Cochran discussed only one treatment note—February 25, 2008[12]—in concluding that Plaintiff's mental status was "essentially normal." He ignored the December 30, 2007 treatment note, which reported that Plaintiff was experiencing ongoing hallucinations, occasional suicidal ideations, hearing voices, and visualizing dark figures, and assessing Plaintiff with a GAF score of 45–50. (*Id.* at 326–27). As discussed above, "a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition." *Punzio*, 630 F.3d at 710. Moreover, Dr. Cochran did not have the benefit of reviewing more extensive records from the DuPage County Health Department (R. at 355–403, 407–54), which were submitted later and support Dr. Penepacker's opinions.[13]

Finally, the ALJ did not provide the specific weight she was affording Dr. Penepacker's opinion. *See Campbell*, 627 F.3d at 308 ("Even if an ALJ gives good reasons for not giving controlling weight to a treating physician's opinion, she has to decide what weight to give that opinion."); *Punzio*, 630 F.3d at 710 ("And whenever an ALJ

---

[12] Dr. Cochran referred to a February 5, 2008 treatment note, but it appears that he meant February 25, 2008. (*Compare* R. at 323 *with id.* at 349).

[13] While the agency consultant opined that Plaintiff was capable of performing simple 1- and 2-step tasks (R. at 353), the ALJ concluded that Plaintiff was capable of performing 1-, 2-, and 3-step tasks (*id.* at 30). Thus, even if the state agency consultant's opinion was entitled to significant weight, the ALJ does not account for her finding that Plaintiff can perform 3-step tasks.

does reject a treating source's opinion, a sound explanation must be given for that decision."). Generally, the Commissioner gives more weight to treating sources, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2). If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider a checklist of factors—"the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion"—to determine what weight to give the opinion. *Moss*, 555 F.3d at 561; 20 C.F.R. § 404.1527.

Here, the ALJ did not explicitly address the checklist of factors as applied to the medical opinion evidence. *See Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (criticizing the ALJ's decision which "said nothing regarding this required checklist of factors"); *Bauer*, 532 F.3d at 608 (stating that when the treating physician's opinion is not given controlling weight "the checklist comes into play"). And many of the factors support the conclusion that Dr. Penepacker's opinion should be given great weight: he is a psychiatrist who treated Plaintiff on a regular basis for almost two years; his findings were supported by diagnostic observations; and his findings were consistent with the medical evidence. "Proper consideration of these factors may

have caused the ALJ to accord greater weight to [Dr. Penepacker's] opinion."[14] *Campbell*, 627 F.3d at 308.

On remand, the ALJ shall reevaluate the weight to be afforded Dr. Penepacker's opinions. If the ALJ has any questions about whether to give controlling weight to Dr. Penepacker's opinions, she is encouraged to recontact Dr. Penepacker, order a consultative examination, or seek the assistance of a medical expert. *See* SSR 96-5p, at *2; 20 C.F.R. §§ 404.1517, 416.917, 404.1527(e)(2)(iii), 416.927(e)(2)(iii); *see also Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) ("If the ALJ thought he needed to know the basis of medical opinions in order to evaluate them, he had a duty to conduct an appropriate inquiry, for example, by subpoenaing the physicians or submitting further questions to them.") (citation omitted). If the ALJ finds "good reasons" for not giving Dr. Penepacker's opinions controlling weight, *see Campbell*, 627 F.3d at 306, the ALJ shall explicitly "consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion," *Moss*, 555 F.3d at 561, in determining what weight to give Dr. Penepacker's opinions.[15]

---

[14] The Commissioner's arguments in support of the ALJ's decision encompass a single page and do little more than parrot the ALJ's decision. (Resp. 4–5).

[15] Plaintiff also contends that the ALJ's credibility finding is not supported by substantial evidence. (Mot. 10–13). In light of the Court's decision to remand for proper consideration of the treating physician's opinions, the Court elects not to address this issue. Nevertheless, on remand, the ALJ is reminded that her decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR

## C. Summary

In sum, the ALJ has failed to "build an accurate and logical bridge from the evidence to her conclusion." *Steele*, 290 F.3d at 941 (internal quotation omitted). This prevents the court from assessing the validity of the ALJ's findings and providing meaningful judicial review. *See Scott*, 297 F.3d at 595. For the reasons set forth herein, the ALJ's decision is not supported by substantial evidence. On remand, the ALJ shall reevaluate the weight to be afforded Dr. Penepacker's opinions, explicitly addressing the required checklist of factors. The ALJ shall reassess Plaintiff's credibility with due regard for the full range of medical evidence. The ALJ shall then reevaluate Plaintiff's physical and mental impairments and RFC, considering all of the evidence of record, including Plaintiff's testimony, and shall explain the basis of her findings in accordance with applicable regulations and rulings.

## V. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [13] is **GRANTED**, and Defendant's Motion for Summary Judgment [15] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and

---

96–7p, at *2. The ALJ should avoid turning "the credibility determination process on its head by finding statements that support the ruling credible and rejecting those statements that do not, rather than evaluating the [claimant's] credibility as an initial matter in order to come to a decision on the merits." *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 788 (7th Cir. 2003). "[A]lthough it is appropriate for an ALJ to consider a claimant's daily activities when evaluating [his] credibility, SSR 96-7p, at *3, this must be done with care. . . . [A] person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time." *Roddy v. Astrue*, — F.3d — , No. 12-1682, 2013 WL 197924, at *7 (7th Cir. Jan. 18, 2013).

the case is remanded to the Commissioner for further proceedings consistent with this opinion.

ENTER:

Dated: February 19, 2013

_Mary M Rowland_
_____

MARY M. ROWLAND
United States Magistrate Judge